IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| ERIC F. SCHOLL and JACQUELINE R. SCHOLL, individually and as parents and next friends of J.J.S., a minor child,<br><br>Plaintiffs,<br><br>v.<br><br>WALGREENS SPECIALTY PHARMACY, LLC d/b/a ALLIANCERX WALGREENS PRIME, a foreign drug company, and WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC, a foreign company,<br><br>Defendants. | CJ-2021-02181<br><br>Case No.<br><br>JUDGE Caroline Wall<br><br>DISTRICT COURT FILED<br>JUL 3 0 2021<br>DON NEWBERRY, Court Clerk<br>STATE OF OKLA. TULSA COUNTY |

**PETITION**

**COME NOW** the Plaintiffs, Eric F. Scholl and Jacqueline "Jacque" R. Scholl, individually, and as parents and next friends of J.J.S., a minor child, and for their causes of action against Defendants Walgreens Specialty Pharmacy, LLC d/b/a AllianceRX Walgreens Prime and Walgreens Specialty Pharmacy Holdings, LLC (collectively, "Walgreens Prime") do state and aver as follows:

**The Parties and Jurisdiction**

1. Plaintiffs Eric and Jacque Scholl are individuals residing in Tulsa County, State of Oklahoma. Eric and Jacque Scholl are the adoptive parents of J.J.S., who is a minor child residing with her adoptive parents within the confines of Tulsa County, State of Oklahoma.

2. The events giving rise to the causes of action herein took place in Tulsa County, State of Oklahoma.

3. Defendant Walgreens Specialty Pharmacy, LLC is a foreign limited liability company doing business in Oklahoma.

EXHIBIT 1

4. Defendant Walgreens Specialty Pharmacy Holdings, LLC is a foreign limited liability company doing business in Oklahoma.

5. Walgreens Prime conducts business in Oklahoma under the assumed name "Walgreens Prime," and operates a specialty pharmacy that has systematic and repeated contacts with the State of Oklahoma. Walgreens Prime has sufficient contacts with the State of Oklahoma to confer this Court with both specific and general personal jurisdiction over it in this matter.

6. This Honorable Court has jurisdiction over the parties, and it is the proper venue for the maintenance of this action.

## Family Background

7. In 2012, Eric and Jacque Scholl adopted J.J.S. from an orphanage in Guangdong Province, China. J.J.S. was five (5) years old at the time, and Eric and Jacque were told by the adoption agency that J.J.S. had some hearing and vision loss. Jacque is an audiologist, and she and Eric thought it was meant to be they were placed with a child that could benefit both from their love and affection, as well as Jacque's specialized training relating to hearing loss.

8. When the adoption was complete and Eric and Jacque first met J.J.S. in December of 2012, they immediately learned that J.J.S. did not just have hearing deficits, J.J.S. was completely deaf. The complete hearing loss did not deter the Scholls, as they were both immediately taken by J.J.S.'s spirit and vibrant personality.

9. Jacque immediately began working to see if cochlear implants were an option for J.J.S. Ultimately, Jacque discovered an engineer located at the headquarters of a cochlear implant company in Austria who had designed a special algorithm for the necessary power J.J.S. needed in order to hear speech. In February of 2013, J.J.S. got her first cochlear implant in her left ear. She was able to receive an implant for her right ear shortly thereafter.

10. While J.J.S. could now hear with the aid of cochlear implants, she has quite significant verbal deficits from the inability to hear for nearly the first six (6) years of her life. J.J.S. uses a combination of verbal communication and Signed Exact English (SEE) to communicate.

### Facts Relating to Walgreens Prime

11. In April and May of 2020, J.J.S. began having intermittent abdominal pain. The pain became so severe by mid-May Jacque took J.J.S. to the hospital where she received an ultrasound. After the ultrasound and an exploratory surgery, J.J.S. was diagnosed with vaginal agenesis.

12. Vaginal agenesis is a rare disorder. In J.J.S.'s case, the soft tissue between the uterus and vagina did not get absorbed in utero and therefore does not allow fluid and material to be expelled from the uterus during menstruation.

13. This condition is difficult to deal with in young women such as J.J.S., who was thirteen (13) at the time of this diagnosis. Surgical intervention requires reproductive decisions that a thirteen (13) year old is not capable of making, along with the use of dilaters post-surgery.

14. After consultation with physicians, the Scholls decided the best option for J.J.S. was to have Lupron Depot shots which would prevent J.J.S. from ovulating so she could grow older and more mature to the point where she is capable of participating in surgical decisions which will impact her reproductive capabilities for the rest of her life.

15. Lupron Depot is a specialty drug that can only be obtained through a specialty pharmacy such as Walgreens Prime, which was the only specialty pharmacy contracted for this medication by the Scholl's insurance carrier, Blue Cross Blue Shield (BCBS) of Oklahoma.

16. The Scholls were almost immediately able to get the Lupron Depot shot preauthorized by BCBS after J.J.S.'s specialist advised them it was urgent.

17. Thereafter, Jacque Scholl contacted Walgreens Prime pharmacy about getting the Lupron Depot shot. Time was of the essence, as the Lupron Depot shot was needed before J.J.S.'s next menstruation. Mrs. Scholl was told that Walgreens Prime was going to send the shot directly to Dr. Hildebrand's office. During this call, Mrs. Scholl even offered to pay directly for the shot if there were any problems with insurance. Mrs. Scholl was made to believe at this time that paying directly was not an option, but was again promised that the shot would be sent to Dr. Hildebrand in time to prevent J.J.S. from having another menstruation. Mrs. Scholl relied on this promise.

18. Additionally, staff from Dr. Hildebrand's office repeatedly contacted Walgreens Prime about getting the shot. On some occasions Walgreens Prime would act as if they did not know what was going on, on other occasions Dr. Hildebrand's staff would be told that the shot would be sent in time for J.J.S. to avoid another menstruation.

19. At this point, Ms. Scholl was completely relying on Walgreens Prime to do what they said they would do. There was not enough time for Ms. Scholl to get BCBS to authorize another specialty pharmacy to send the shot nor did BCBS contract with any other specialty pharmacy for this drug, and Mrs. Scholl was led to believe by Walgreens Prime that paying out of pocket without insurance was not an option.

20. During this period of time, J.J.S. was given oral contraceptives in an attempt to stop her menstruation.

21. On July 8, 2020, J.J.S.'s abdomen began hurting again and she began to run a fever. J.J.S.'s pediatrician sent her to the emergency room and that evening she had emergency surgery to empty her uterus and to remove her inflamed appendix. The inflamed appendix was a secondary

effect of the uterus inflammation due to the inability to expel fluids and material during her monthly menstruation. J.J.S. was in incredible pain before and after this surgery, and she told her mother she believed she was going to die. J.J.S. was not released from the hospital until July 11, 2020.

22. This hospitalization, as well as the subsequent hospitalization discussed below, were particularly traumatic because of J.J.S.'s limited ability to communicate and the hospital's COVID-19 restrictions.

23. J.J.S. was rushed to the emergency room and readmitted for extreme abdominal pain associated with the surgery on July 14, 2020.

24. At this point, Ms. Scholl was beyond upset and furious with Walgreens Prime. She again began calling BCBS, Walgreens Prime, and even the maker of the drug – AbbVie. There was no apparent reason for Walgreens Prime not to send the injection since the authorization had been in place hours after the request from the specialist. Mrs. Scholl had so many calls with Walgreens Prime where she would get no help from anyone that she began crying, yelling, screaming, and begging for someone to send her the shot so this would not happen to her little girl again. Ms. Scholl was told that all of her calls to Walgreens Prime were recorded.

25. At this point, Mrs. Scholl started trying to get the Lupron Depot shot from other specialty pharmacies and begged BCBS for a one-time override to use someone else. However, she was always concerned that if she asked BCBS to cancel the authorization with Walgreens Prime and authorize another specialty pharmacy to dispense the shot the process would only start over again and the shot would be delayed even further.

26. At some point during this process, Mrs. Scholl learned that a specialty pharmacy could allow someone to pay directly for a drug outside of insurance approval, but this was not what Mrs. Scholl was led to believe before J.J.S.'s July 2020 hospitalizations.

27. It was not until July 21, 2020, that Walgreens Prime finally delivered the Lupron Depot shot to Dr. Hildebrand. The shot was given to J.J.S. that day. This was only after numerous calls from both Mrs. Scholl and Dr. Hildebrand's office staff literally begging for the medication.

28. J.J.S. receives a Lupron Depot shot every three (3) months.

29. Since July 21, 2020, Mrs. Scholl has purchased an additional Lupron Depot injection from another pharmacy out of her own pocket and without insurance proceeds to make sure that this situation never happens to her daughter again.

## Cause of Action – Negligence/Gross Negligence

30. Plaintiffs hereby incorporate by reference all prior paragraphs as if restated herein.

31. Defendant Walgreens Prime promised and had authorization to deliver a Lupron Depot shot to J.J.S.'s physician on a timely basis to prevent J.J.S. from menstruating in July of 2020.

32. Plaintiffs relied on this promise to their detriment.

33. Defendant Walgreens Prime's actions and inactions in failing to timely deliver the Lupron Depot shot constitute negligence and rise to the level of gross negligence.

34. As a result of Defendants negligence, Plaintiffs Eric Scholl and Jacque Scholl, individually and on behalf of their minor child and J.J.S., have suffered damages in the form of surgical and medical expenses, past, present, and future physical pain and suffering, and past, present, and future mental anguish.

35. Plaintiffs claim all damages available under Oklahoma law for all causes of action herein.

## Punitive Damages

36. Plaintiffs hereby incorporate by reference all prior paragraphs as if restated herein.

37. The actions and inactions of Walgreens Prime were sufficiently reckless, willful, and wanton to justify punitive damages to deter these Defendants, and other similarly situated specialty pharmacies, from acting in a similar manner in the future.

**WHEREFORE**, premises considered, Plaintiffs hereby request judgment in their favor on all causes of action herein for actual damages in an amount in excess of the jurisdictional limit for diversity jurisdiction in federal court, along with punitive damages, attorneys' fees and costs, along with any other and further relief the Court and jury deem just and equitable.

Respectfully submitted,

_____
Andrew C. Jayne, OBA #19493
BAUM GLASS JAYNE CARWILE & PETERS
2000 Mid-Continent Tower
401 S. Boston Avenue
Tulsa, Oklahoma 74103
(T) 918/938.7944; (F) 918/938.7966
Email: ajayne@bgjclaw.com
***ATTORNEY FOR PLAINTIFFS***