# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| ERIC F. SCHOLL and JACQUELINE R. SCHOLL, individually and as parents and next friends of J.J.S., a minor child, | ) ) ) | |
|  | ) | |
| Plaintiffs, | ) | Case No. 4:21-cv-00363-CVE-MTS |
|  | ) | |
| v. | ) | |
|  | ) | |
| WALGREENS SPECIALTY PHARMACY, LLC d/b/a ALLIANCERX WALGREENS PRIME, a foreign drug company, and WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC, a foreign company, | ) ) ) ) ) | |
|  | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF DEFENDANTS WALGREENS SPECIALTY PHARMACY, LLC D/B/A ALLIANCERX WALGREENS PRIME AND WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC**

Respectfully submitted,

**HOLDEN LITIGATION,** *Holden P.C.*

/s/ *Caleb McKee*
Steven E. Holden, OBA #4289
Caleb McKee, OBA #32066
15 East 5th Street, Suite 3900
Tulsa, OK 74103
(918) 295-8888
(918) 295-8889 fax
SteveHolden@HoldenLitigation.com
CalebMcKee@HoldenLitigation.com
*Attorneys for Defendants Walgreens Specialty Pharmacy, LLC and Walgreens Specialty Pharmacy Holdings, LLC*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 2

      A.   J.J.S.'s Diagnosis and Treatment ................................................... 2

      B.   J.J.S.'s Lupron Depot Prescription ................................................. 2

      C.   AllianceRx's Policies and Procedures ............................................ 3

      D.   AllianceRx's First Attempt to Obtain Prior Authorization.............. 5

      E.   AllianceRx's Second Attempt to Obtain Prior Authorization .............. 7

      F.   AllianceRx's Third and Fourth Attempts to Obtain Prior Authorization .............. 8

      G.   Approval of Prior Authorization by BCBSOK........................................ 9

      H.   J.J.S.'s Hospitalizations and Filling of Lupron Depot Prescription..................... 11

III.  ARGUMENT AND AUTHORITY ................................................................. 13

      A.   Standard of Review........................................................................ 13

      B.   Governing Law .............................................................................. 13

      C.   Any Duty on the Part of AllianceRx to Fill J.J.S.'s Prescription in June 2020
           Terminated upon the Closing of AllianceRx's File at 12:52 pm on June 16, 2020
           ....................................................................................................... 16

      D.   After Closing its File at 12:52 pm on June 16, 2020, AllianceRx Did Not Assume
           a Duty to Fill the Lupron Depot Prescription Until July 13, 2020 ...................... 19

      E.   There is no Causal Connection between AllianceRx's filling of the Lupron Depot
           Prescription in July 2020 and Plaintiffs' Injuries ................................................. 22

IV.   CONCLUSION................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Smith & Nephew, P.L.C.,* 98 F. Supp. 2d 1287, 1296 (N.D. Okla. 2000) ............... 23

*Banner Bank v. Smith,* 25 F.4th 782, 789 (10th Cir. 2022) .......................................... 13

*Beugler v. Burlington N. & Santa Fe Ry. Co.,* 490 F.3d 1224, 1229 (10th Cir. 2007)................ 14

*Brewer v. Murray*, 2012 OK CIV APP 109, ¶ 22, 292 P.3d 41, 50, *as corrected* (May 30, 2013) ................................................................................................................ 14

*Fry Land & Cattle Co. v. Colorado Interstate Gas Co.,* 1990 OK CIV APP 113, 805 P.2d 695, 696 ........................................................................................................ 15, 22

*Harwood v. Ardagh Grp.,* 2022 OK 51, ¶ 28, 522 P.3d 473, 481, *as corrected* (Sept. 19, 2022) (citing the Restatement (Second) of Torts § 323 (1965)) ...................................... 15

*Harwood v. Ardagh Grp.,* 2022 OK 51, ¶ 28, 522 P.3d 473, 481, *as corrected* (Sept. 19, 2022)Restatement (Second) of Torts § 323, cmt. c (1965)...................................... 16

*Harwood v. Ardagh Grp.,* 2022 OK 51, ¶ 28, 522 P.3d 473, 481, *as corrected* (Sept. 19, 2022)Restatement (Second) of Torts § 323, cmt. c ............................................ 19

*Hill v. Witt,* 2010 WL 2902246, at *2 (N.D. Okla. July 22, 2010)................................. 13

*Johnson v. Fine*, 2002 OK CIV APP 47, ¶ 8, 45 P.3d 441, 443 .................................... 14

*Lowery v. Echostar Satellite Corp.,* 2007 OK 38, ¶ 14, 160 P.3d 959, 964 ....................... 14

*McGehee v. Forest Oil Corp.,* 908 F.3d 619, 624 (10th Cir. 2018)............................... 13

*McGehee.,* 908 F.3d at 625–26 ...................................................................... 14

*Pharmcare Oklahoma, Inc. v. State Health Care Auth.,* 2007 OK CIV APP 5, ¶ 30, 152 P.3d 267, 273 ...................................................................................... 14

*Pharmcare Oklahoma, Inc.,* 2007 OK CIV APP 5 at ¶¶ 29-30, 152 P.3d 267, 273.................. 14

**Other Authorities**

Pharmacists and druggists, 3 Modern Tort Law: Liability and Litigation § 24:139 (2d ed.) ....... 15

**Oklahoma Admin Codes**

Okla. Admin. Code § 535:15-3-2 .................................................................. 15

Okla. Admin. Code § 24:139 ...................................................................... 15

Okla. Admin. Code § 535:10-9-2 .................................................................. 15

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................ 13

Federal Rule of Civil Procedure 56 .............................................................. 13

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Walgreens Specialty Pharmacy, LLC d/b/a AllianceRx Walgreens Prime and Walgreens Specialty Pharmacy Holdings, LLC, (collectively "AllianceRx"), respectfully moves for summary judgment on the claims of Plaintiffs Eric F. Scholl and Jacqueline R. Scholl, individually and as parents and next friends of J.J.S., a minor child, (collectively "Plaintiffs")

## I.    INTRODUCTION

Plaintiffs allege that AllianceRx represented that it would timely fill a Lupron Depot prescription for J.J.S., but failed to do so. Plaintiffs assert that, as a result, their daughter, J.J.S. experienced complications from a rare condition called vaginal agenesis. Plaintiff complain that these complications required an emergency surgery on July 8, 2020, and a second hospitalization on July 15, 2020. (Ex. 29 – Timeline of Events).

AllianceRx is a specialty pharmacy that dispenses drugs with special handling, storage, and distribution requirements. Because Lupron Depot is only covered under Plaintiffs' major medical insurance benefits, it required prior authorization from Plaintiffs' insurer, Blue Cross and Blue Shield of Oklahoma ("BCBSOK") before the prescription could be filled. Pursuant to AllianceRx's policies and procedures, its representatives made three unsuccessful attempts between June 11-16, 2020 to obtain a prior authorization for the Lupron Depot prescription before closing its file on June 16, 2020 at approximately 12:52 p.m. Further, after closing its file, AllianceRx did not again assume a duty to fill the Lupron Depot prescription until July 13, 2020, when it received notice that the prior authorization had been approved. Subsequently thereafter, AllianceRx timely filled the Lupron Depot prescription on July 21, 2020. (Ex. 29 – Timeline of Events)

-1-

AllianceRx acted appropriately in terminating any duty it assumed to fill the Lupron Depot prescription in June 2020, after a prior authorization had not been obtained. AllianceRx also timely filled the Lupron Depot prescription in July 2020. Further, there is no causal connection between AllianceRx's alleged acts or omissions and Plaintiffs' injuries. Accordingly, granting summary judgment in favor of AllianceRx is warranted.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    J.J.S.'s Diagnosis and Treatment**

1.    Plaintiffs' adopted, minor daughter, J.J.S., was diagnosed with a rare disorder known as "vaginal agenesis" in May 2020. (Ex. 1 – Petition, ¶¶ 1, 7, 11; Ex. 2 – May 29, 2020, Operative Report of Dr. Catherine Hildebrand, p. OBGYNST per SDT 0199; Ex. 3 – Tr. of November 22, 2022 deposition of Dr. Catherine Hildebrand, 14:12 – 17:3).

2.    Vaginal agenesis is a soft tissue obstruction between the lower and upper vagina which causes an inability to expel the bodily materials associated with menstruation. (Ex. 3, 16:13-18).

3.    In lieu of surgical treatment, Plaintiffs, in consultation with J.J.S.'s treating OB/GYN, Dr. Catherine Hildebrand ("Dr. Hildebrand"), determined to treat J.J.S.'s condition by suppressing her menstruation with a drug called Lupron Depot. (Ex. 1, ¶ 14; Ex. 3, 19:20 – 20:23).

**B.    J.J.S.'s Lupron Depot Prescription**

1.    On June 1, 2020, Dr. Hildebrand's office sent a request for benefit investigation to Abbvie, the manufacturer of Lupron Depot. (Ex. 4 – Pharmacy Solutions Referral Form, p. OBGYNST per SDT 0134).

2.      On June 2, 2020, Abbvie faxed the benefits summary to Dr. Hildebrand's office.

(*Id.*). The Abbvie benefits summary states in pertinent part:

> l. Prior Authorization
> Pre-determination is recommended in order for the medication to be covered by the insurance. The prescriber may need to provide clinical information to support this request. Additional information may be located on the patient's insurance card. **The approximate turn-around time is 7-14 days after initiation with the insurance company,** BCBS of Oklahoma Phone Number: (800) 496-5774

(*Id.*).

3.      The Abbvie benefits summary further states that the prescription information for Lupron Depot would be forwarded to the in-network pharmacy for Plaintiffs health insurer, AllianceRx. (*Id.* at p. OBGYNST per SDT 0137).

## C.    AllianceRx's Policies and Procedures

1.      AllianceRx is a specialty pharmacy that dispenses drugs with special handling, storage, and distribution requirements. (Ex. 5 - Tr. of May 31, 2022 deposition of Catherine Cirrincione, 38:17 – 39:9).

2.      Prescriptions that require prior authorization from a health insurer enter an exception stage to AllianceRx's prescription fill process called "Pharmacist Callback." (Ex. 5, 63:20 – 64:12, 64:16 – 65:18, 66:1 -69:5; Ex. 6 – AllianceRx Priority Chart, WALGREENS 00043).

3.      When a prescription enters the Pharmacist Callback exception stage it is placed in a queue to be resolved by AllianceRx representatives based upon priority. (Ex. 5, 63:20 – 64:12, 64:16 – 65:18, 66:1 -69:5; Ex. 6, WALGREENS 00043). The relevant priorities are Standard, and Stat Urgent/Urgent. (Ex. 5, 63:20 – 64:12, 64:16 – 65:18, 66:1 -69:5; Ex. 6, WALGREENS 00043).

4.      A prescription is elevated to Stat Urgent/Urgent priority if the patient or their prescribing doctor state that the prescription is needed within 24 hours. (Ex. 5, 60:6-13).

5.      As a new patient/new referral, J.J.S.'s prescription was considered standard priority. (Ex. 5, 60:14-19, 61:12-17). Under the standard priority cadence, an AllianceRx representative is required to make three attempts to obtain the information needed to resolve the exception – i.e. obtain the prior authorization. (Ex. 6, WALGREENS 00043; Ex. 5, 61:24 – 69:1, 86:21 – 101:7).

6.      In this case, an insurance verification specialist was, on the first attempt, to contact the doctor's office via fax or e-prescription ("ERX") to have the doctor's office initiate the prior authorization process. (Ex. 6, WALGREENS 00043; Ex. 5, 61:24 – 69:1, 86:21 – 101:7). On the second and third attempts, an insurance verification specialist was required to contact the doctor's office by phone, fax, or ERX. (Ex. 6, WALGREENS 00043; Ex. 5 - 61:24 – 69:1, 86:21 – 101:7).

7.      If the prior authorization process was not initiated by the third attempt, AllianceRx's policies and procedures stated that the prescription should be referred for "No Go" approval and the patient informed. (Ex. 6, WALGREENS 00026; Ex. 5, 100:7 – 107:3).

8.      When a prescription is referred for No Go approval the documented contact attempts are reviewed by a separate AllianceRx representative to ensure that the appropriate policies and procedures were followed. (Ex. 6, WALGREENS 00043; Ex. 7 – Recent Assessment Report, WALGREENS 00026; Ex. 5, 100:7 – 107:3). If the appropriate policies were followed then the No Go is approved and the prescription file is closed. (Ex. 6, WALGREENS 00043; Ex. 7, WALGREENS 00026; Ex. 5, 100:7 – 107:3).

9.      AllianceRx's corporate representative testified at deposition that part of the purpose of this policy is to ensure that prescription orders are filled timely, and do not remain pending for an overlong amount of time. (Ex. 5, 38:1-11, 43:1-6, 125:2-14, 153:6-19).

10.     AllianceRx's corporate representative testified at deposition that AllianceRx's representatives appropriately followed the company's policies and procedures, and that no representatives were disciplined in any way as a result of what Plaintiffs' allege in this case. (Ex. 5, 127:14-22, 149:13-22, 149:23 – 151:4).

11.     AllianceRx's corporate representative further testified at deposition that the industry standard turnaround time for prescriptions requiring intervention, including a prior authorization, was approximately six-eight business days. (Ex. 5, 43:22 – 44:8, 56:22 – 57:9).

12.     AllianceRx also permits patients to pay for prescriptions directly out of pocket. (Ex. 5, 32:4-6, 32:23 – 33:1, 34:10-20, 86:11-15, 147:17 – 148:1; Ex. 8 - Tr. of June 8, 2023 deposition of Darlene Rojas, 20:5-7). Cash transactions are handed by AllianceRx's billing department. (*Id.* at 20:8 – 21:8).

**D.      AllianceRx's First Attempt to Obtain Prior Authorization**

1.      On June 2, 2020, AllianceRx received prescription information related to the Lupron Depot for J.J.S. through the Abbvie portal. (Ex. 9 – Consolidated Patient Notes of J.J.S., p. WALGREENS 0002).

2.      However, because the request through the Abbvie portal was not a legally valid prescription, AllianceRx was required to obtain a valid Lupron Depot prescription directly from Dr. Hildebrand. . (Ex. 9, p. WALGREENS 0002; Ex. 5, 70:1 - 72:13).

3.      The Lupron Depot prescription was validated by Dr. Hildebrand's office on June
3, 2020. (Ex. 9, p. WALGREENS 0002, 0012; Ex. 10 – Tr. of August 30, 2023 deposition
of Kristen Cornwell, 52:1 – 53:12).

4.      Also, on June 3, 2020, AllianceRx's insurance department ran a test claim for
insurance coverage of the Lupron Depot prescription with Plaintiff's health insurer,
BCBSOK. (Ex. 9 , p. WALGREENS 0003; Ex. 5, 79:20 – 80:7). The test claim was
rejected by BCBSOK because the Lupron Depot prescription was based upon a 90-day
supply rather than a 30-day supply. (*Id*; *Id.*).

5.      On June 4, 2023, an AllianceRx pharmacy technician re-entered the Lupron Depot
prescription with a 30-day supply, and the prescription request was again forwarded to
AllianceRx's insurance department for benefits investigation. (Ex. 9, WALGREENS
00012; Ex. 5, 79:20 – 80:7).

6.      On June 9, 2020, AllianceRx's insurance department verified that the Lupron Depot
prescription would not be covered under the pharmacy benefits portion of Plaintiffs' health
insurance plan, and that it was necessary to verify with BCBSOK whether the prescription
would be covered under the major medical benefits portion of Plaintiffs' health insurance
plan. (Ex. 9, WALGREENS 00013; Ex. 5, 79:20 – 80:7).

7.      On June 11, 2020, AllianceRx insurance verification specialist, Janet Jebi verified
that the Lupron Depot prescription would be covered under the major medical benefits
portion of Plaintiffs' health insurance plan, and that coverage was dependent upon prior
authorization from BCBSOK. (*Ex. 9,* WALGREENS 0003, 00013; Ex. 11 – June 11, 2020
Tr. of call Amber BCBS to Janet AllianceRx, pp. BCBS_000569-000571).

8.      Plaintiffs' health insurer, BCBSOK requires the prescribing physician initiate the prior authorization process. (Ex. 12 – Tr. of May 18, 2023 deposition of Jason Jaramillo 19:3 - 20:1 Ex. 10, 54:20-24; Ex. 4, p. OBGYNST per SDT 0137; Ex. 13, - AllianceRx Fax Cover Sheet).

9.      Jason Jaramillo – the BCBSOK clinical review pharmacist that ultimately approved the prior authorization at issue in this case, testified at deposition that the purpose of a prior authorization is to pre-determine whether a drug is covered under the medical benefits portion of an insured's plan. (Ex. 12, , 18:18 – 20:1. 21:18 – 22:14). Mr. Jaramillo further testified that clinical review pharmacists review clinical notes, images, and other documents submitted by the prescribing physician along with BCBSOK policies to determine if a drug is medically necessary. (Ex. 12, 21:18 – 22:14, 23:16 – 26:2).

10.      Consequently, also on June 11, 2020, AllianceRx insurance verification specialist, Janet Jebi faxed the paperwork for initiating the prior authorization to the office of J.J.S.'s prescribing OB/GYN, Dr. Hildebrand. (Ex. 9. WALGREENS 0003; Ex. 13,; Ex. 10, 53:13 – 56:5).

**E.      AllianceRx's Second Attempt to Obtain Prior Authorization**

1.      On or before 3:42 pm on June 15, 2020, AllianceRx insurance verification specialist, Janet Jebi spoke with "Tina" in Dr. Hildebrand's office. Tina stated they would follow up with Dr. Hildebrand's nurse to work on the prior authorization request and call back. (Ex. 9, WALGREENS 0003; Ex. 10, 56:6-22).

2.      On or before 5:01 pm on June 15, 2020, AllianceRx insurance verification specialist, Janet Jebi also spoke with Kristen Cornwell in Dr. Hildebrand's office and informed Ms. Cornwell that she would need to contact BCBSOK to initiate the prior

authorization process. (Ex. 9, WALGREENS 0003; Ex. 10, – Tr. of August 30, 2023 deposition of Kristen Cornwell, 57:1-24).

3.    Also on June 15, 2020, at 5:28 p.m., AllianceRx patient-care advocate, Mykeila Carrington spoke with Plaintiff Jacqueline Scholl regarding the status of the Lupron Depot prescription. (Ex. 9, WALGREENS 0003; Ex. `4, – Tr. of August 29, 2022 deposition of Mykeila Carrington, 65:14 – 66:3). During that call, Plaintiff Jacqueline Scholl was informed that a prior authorization was needed. (Ex. 9 – Consolidated Patient Notes of J.J.S., WALGREENS 0003; Ex. 14, 65:14 – 68:10).

**F.    AllianceRx's Third and Fourth Attempts to Obtain Prior Authorization**

1.    On June 16, 2020, at or before 10:48:45 am, AllianceRx insurance verification specialist, Janet Jebi contacted BCBSOK and spoke with "Katie." (Ex. 9, WALGREENS 0003; Ex. 15 – Tr. of June 15, 2020 call Katie D. BCBS to Janet AllianceRx, BCBS_000572). Katy stated there was no prior authorization on file and Dr. Hildebrand's office had not called to start a prior authorization. (Ex. 9, WALGREENS 0003; Ex. 15, BCBS_000573).

2.    On June 16, 2020, also at or before 10:48:45 am, AllianceRx insurance verification specialist, Janet Jebi also contacted Kristen Cornwell in Dr. Hildebrand's office. Ex. 9 , WALGREENS 0003). Kristen Cornwell stated that she would call BCBSOK to start a prior authorization request. (Ex. 9 , WALGREENS 0003). AllianceRx received no other communication from Dr. Hildebrand's office until July 13, 2020. Ex. 9, WALGREENS 0003).

3.    Also on June 16, 2020, at or before 10:48:55 am, at the request of AllianceRx patient-care advocate, Mykeila Carrington, a different AllianceRx insurance verification

specialist contacted BCBSOK and verified that Dr. Hildebrand's office had not initiated a prior authorization request. (Ex. 9 , WALGREENS 0003; Ex. 27 – Tr. of June 16, 2020, call April BCBS to Cheryl, BCBS_000575; Ex. 14, 68:12-18).

4.      On June 16, 2020, at or before 10:50:17 am, AllianceRx insurance verification specialist, Janet Jebi notes in the Consolidated Patient Notes of J.J.S.: "Please put on hold until Prior Authorization is obtained. Please approve for NO GO." (Ex. 9 – Consolidated Patient Notes of J.J.S., WALGREENS 0003).

5.      On June 16, 2020, at or before 10:51:40, patient-care advocate, Mykeila Carrington left a voicemail for Plaintiff Jacqueline Scholl informing her that a prior authorization had not been initiated between Dr. Hildebrand's office and BCBSOK and that Dr. Hildebrand's office needed to contact BCBSOK to initiate the process. (Ex. 9 – Consolidated Patient Notes of J.J.S., WALGREENS 0003; Ex. 14, 43:7-8, 67:11-12, 68:11-24).

6.      The "NO GO" previously requested by AllianceRx insurance verification specialist, Janet Jebi, was approved and the prescription file closed at approximately 12:52 pm on June 16, 2020. (Ex. 9 , WALGREENS 3, 13; Ex. 7, WALGREENS 00026-00027; Ex. 16 – Referral Summary Notes, WALGREENS 715).

## G.      Approval of Prior Authorization by BCBSOK

1.      On June 16, 2020, at approximately 12:53 pm, Kristen Cornwell in Dr. Hildebrand's office received preliminary prior authorization no. U20168B0WG ("Prior Authorization") from a BCBSOK representative pending verification of J.J.S.'s clinical information. (Ex. 17 – BCBSOK Prior Authorization Records BCBS 455; Ex. 18 – June 16, 2020, Tr. of call Rachel BCBS to Kristin with Dr. Hildebrand, BCBS 584).

2.      On June 16, 2020, between 1:36 pm and 1:41 pm, Plaintiff Jacqueline Scholl telephoned Dr. Hildebrand's office. (Ex. 19 – Cell phone records of Jacqueline Scholl, p. 5 of 51; Ex. 20 - Dr. Hildebrand Telephone/Triage Consultation Form, OBGYNST per SDT 0126; Ex. 10 22:10 – 23:14).

3.      According to records obtained from Dr. Hildebrand's office, as well as the deposition testimony of Kristen Cornwell in Dr. Hildebrand's office, the 1:36 pm phone call on June 16, 2020, was for Plaintiff Jacqueline Scholl to inform Dr. Hildebrand that Mrs. Scholl had consulted with a specialist regarding J.J.S.'s condition, and to get Dr. Hildebrand to write J.J.S. a prescription for birth control to suppress her menstruation. Ex. 20, OBGYNST per SDT 0126; Ex. 10, 22:10 – 23:14).

4.      On June 16, 2020, at approximately 2:55 pm, BCBSOK gave final approval of the Prior Authorization. (Ex. 17, BCBS 455). BCBSOK communicated final approval of the Prior Authorization via letters to Plaintiff Jacqueline Scholl and Dr. Hildebrand. (Ex. 21 - Letters Approving the PABCBS_001007 to BCBS_001012). AllianceRx did not receive a copy of the letters sent to Plaintiff Jacqueline Scholl or Dr. Hildebrand. (*See generally*, Ex. 9, WALGREENS 0002-00022; *see also,* Ex. 12, 25:23 – 28:12; Ex. 5 107:12-21, 158:2-25).

5.      On June 16, 2020, beginning at 3:48 pm, and lasting 77 seconds, an in-bound call occurred from AllianceRx to Plaintiff Jacqueline Scholl. (Ex. 19, p. 5 of 51). AllianceRx has no record of this phone call. (*See generally*, Ex. 9, WALGREENS 0002-00022). There were no further communications between AllianceRx and Plaintiffs until July 16, 2020. (*See generally*, Ex. 9, WALGREENS 0002-00022; *see also,* Ex. 19, pp. 5-13 of 51).

**H.     J.J.S.'s Hospitalizations and Filling of Lupron Depot Prescription**

1.     On July 8, 2020, J.J.S. underwent surgery to remove blood that had accumulated in in her pelvic cavity as a result of menstruation, as well as an appendectomy. (Ex. 1, ¶ 20; Ex. 22 – July 8, 2020 Operative Report of Dr. Ranne, pp. OBGYNST per SDT 0158 – 0161). J.J.S. was discharged from the hospital on July 11, 2020. (Ex. 1, ¶ 21; Ex. 23 – July 11, 2020, Discharge Summaries, pp. 12-13 of 190).

2.     On July 13, 2020, AllianceRx received a call from Kristen Cornwell with Dr. Hildebrand's office. (Ex. 9, WALGREENS 0004). Kristen Cornwell was advised the prescription order was closed because a prior authorization was never received. Ex. 9, WALGREENS 0004). Kristen Cornwell stated that the Prior Authorization was taken care of and that the Lupron Depot was needed ASAP. Ex. 9, WALGREENS 0004). The AllianceRx representative noted that AllianceRx had not been notified the Prior Authorization had been approved, but they would verify the Prior Authorization and initiate the order. (Ex. 9, WALGREENS 0004).

3.     On July 15, 2020, J.J.S. was re-admitted to the hospital after presenting at the St John Emergency Department with symptoms of abdominal pain and vomiting. (Ex. 24 – July 17, 2020, Discharge Summaries, p. 12 of 209).

4.     On July 16, 2020, AllianceRx received a call from Kristen Cornwell at Dr. Hildebrand's office wherein she stated that J.J.S. needed the Lupron Depot as soon as possible because she could not be released from the hospital until she received the injection. (Ex. 9, WALGREENS 0004).

5.      On July 16, 2020, AllianceRx representatives verified that the Prior Authorization had been approved by BCBSOK, and elevated the prescription request to "stat" priority pending verification of Plaintiffs' major medical benefits. (Ex. 9, WALGREENS 0004).

6.      J.J.S. was discharged from the hospital on July 17, 2020. (Ex. – July 17, 2020, Discharge Summaries, p. 8 of 209). She did not receive a Lupron Depot injection prior to discharge. Ex. 24, pp. 12-13 of 209; Ex. 25 – July 16, 2020, H&P Consult of Dr. Hildebrand, p. 34 of 209).

7.      On July 17, 2020, Kristen Cornwell with Dr. Hildebrand's office called AllianceRx and stated the Lupron Depot was needed by July 21, 2020. (Ex. 9, WALGREENS 0005). An AllianceRx representative informed Kristen Cornwell that benefit verification was in the process of being completed. (Ex. 9, WALGREENS 0005)

8.      Plaintiff Jacqueline Scholl also contacted AllianceRx on July 17, 2020, requesting to speak with a supervisor because she was frustrated about the delays and threatening attorney involvement. (Ex. 9, WALGREENS 0006). On the same day, Plaintiff Jacqueline Scholl was subsequently contacted by an AllianceRx research specialist, the benefit verification was completed, and consent to ship the Lupron Depot to Dr. Hildebrand's office was obtained.

9.      On July 20, 2020, delivery of the Lupron Depot prescription was scheduled for July 21, 2020 at Dr. Hildebrand's office. (Ex. 9, WALGREENS 0006).

10.     The Lupron Depot prescription was delivered to Dr. Hildebrand's office on July 21, 2020. (Ex. 26 – AllianceRx Windshield Complaint Log WALGREENS 46).

11.     Dr. Hildebrand offered deposition testimony that Lupron Depot generally begins to work within 10 days of injection, and had J.J.S. received a Lupron Depot injection by

approximately June 28, 2020, her July 8, 2020 surgery and subsequent re-hospitalization on July 15, 2020 could have been avoided. (Ex. 3, 35:9 – 36:8).

### III.    ARGUMENT AND AUTHORITY

**A.    Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of an alleged factual dispute … does not defeat an otherwise properly supported motion for summary judgment. Only material factual disputes preclude summary judgment; immaterial disputes are irrelevant." *Hill v. Witt,* 2010 WL 2902246, at *2 (N.D. Okla. July 22, 2010).

**B.    Governing Law**

In their Petition, Plaintiffs allege negligence in failing to deliver a Lupron Depot shot in a timely manner. "In a diversity case like this, the *Erie* doctrine requires federal courts to apply federal procedural law and state substantive law." *Banner Bank v. Smith,* 25 F.4th 782, 789 (10th Cir. 2022).

> To prove a negligence claim under Oklahoma law, the plaintiff must show duty, breach, and causation—(1) a duty owed by defendant to protect plaintiff from injury, (2) defendant's failure to properly exercise or perform that duty, and (3) defendant's failure to exercise his duty of care proximately caused plaintiff's injury.

*McGehee v. Forest Oil Corp.,* 908 F.3d 619, 624 (10th Cir. 2018) "Whether a duty exists is a threshold legal question for the court." *Id.*

> The most important consideration in the determination of whether a duty exists is foreseeability. [A] 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks which make the conduct unreasonably dangerous.' Foreseeability establishes a "zone of risk," that is, whether the conduct 'creates a generalized and foreseeable risk of harming others.' 'Where a defendant's conduct creates a foreseeable zone of risk, the law generally

will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.'

*Johnson v. Fine*, 2002 OK CIV APP 47, ¶ 8, 45 P.3d 441, 443 (citations omitted). "Foreseeability . . . is a minimum threshold legal requirement for opening the courthouse doors." *Brewer v. Murray*, 2012 OK CIV APP 109, ¶ 22, 292 P.3d 41, 50, *as corrected* (May 30, 2013) (citations omitted).

> [However, a] foreseeable risk of harm alone is not enough to establish a duty of care under Oklahoma law. The plaintiff must be 'foreseeably endangered by defendant's conduct with respect to all risks that make the conduct unreasonably dangerous.'
> * * *
> Accordingly, . . . if a risk of harm was foreseeable but the risk did not make the defendant's conduct unreasonably dangerous, no duty of care will be found. 'And, if the defendant did not owe a duty of care to the plaintiff, there can be no liability for the negligence as a matter of law.'

*McGehee.,* 908 F.3d at 625–26 (citations omitted) (emphasis added). "[T]he foreseeability inquiry [must be tethered] to the anchor the Oklahoma Supreme Court has specified: the 'risks which make the conduct unreasonably dangerous.'" *Beugler v. Burlington N. & Santa Fe Ry. Co.,* 490 F.3d 1224, 1229 (10th Cir. 2007) (citation omitted). "Foreseeable risk of harm that will lead the law to say a particular plaintiff is entitled to protection will not generally be extended beyond reason and good sense." *Lowery v. Echostar Satellite Corp.,* 2007 OK 38, ¶ 14, 160 P.3d 959, 964.

In Oklahoma, a pharmacy's "duties include accurately filling and dispensing prescriptions, advising by counseling or providing other information, or the provision of other services that are necessary to providing pharmaceutical care*." Pharmcare Oklahoma, Inc. v. State Health Care Auth.,* 2007 OK CIV APP 5, ¶ 30, 152 P.3d 267, 273. However, there is no express duty for a pharmacy to fill a prescription within a certain amount of time. *See generally, Pharmcare Oklahoma, Inc.,* 2007 OK CIV APP 5 at ¶¶ 29-30, 152 P.3d 267, 273 ("A pharmacist's duty to [a] patient is clearly defined and limited under the Pharmacy Act."); *see also, generally,* Okla. Admin.

Code § 535:10-9-2 (setting forth the responsibilities of counseling a patient as part of pharmaceutical care); Okla. Admin. Code § 535:15-3-2 (setting forth the responsibilities of a pharmacy). Nor does a pharmacy have a duty to fill a prescription free of charge. *See generally, id.* The limited duties of pharmacies and pharmacists that have thus far been recognized in Oklahoma are consistent with the majority of jurisdictions that have considered the issue of a pharmacist's/pharmacy's duty. The majority of American courts that have addressed this issue have likewise found the duties of a pharmacist and their employing pharmacy limited to accurately filling a facially valid prescription and accurately advising patients. *See,* § 24:139. Pharmacists and druggists, 3 Modern Tort Law: Liability and Litigation § 24:139 (2d ed.) (attached as Ex. 28).

Nevertheless, one may also assume a duty with an affirmative act. *See Harwood v. Ardagh Grp.,* 2022 OK 51, ¶ 28, 522 P.3d 473, 481, *as corrected* (Sept. 19, 2022) (citing the Restatement (Second) of Torts § 323 (1965)).

> One who undertakes, gratuitously or for consideration, to render services to another which he (or she) should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his (or her) failure to exercise reasonable care to perform the undertaking if:
>
> (a) his (or her) failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*See also, Fry Land & Cattle Co. v. Colorado Interstate Gas Co.,* 1990 OK CIV APP 113, 805 P.2d 695, 696. ("Even when a person has no duty to act with regard to a matter, if he volunteers to assume that duty, either expressly or by his conduct, he must exercise ordinary care and is liable for injury resulting from his failure to do so." ).

However, even where one may assume a duty, that assumption is not indefinite.

> "c. Termination of services. **The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue them indefinitely, or even until he has done everything in his power to aid and protect the other.** The actor may normally abandon his

efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him. His motives in discontinuing the services are immaterial. **It is not necessary for him to justify his failure to continue the services by proving a privilege to do so, based upon his private concerns which would suffer from the continuance of the service. He may without liability discontinue the services** through mere caprice, or because of personal dislike or enmity toward the other.

Where, however, the actor's assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated.

Restatement (Second) of Torts § 323, cmt. c (1965) (emphasis added).

## C.    Any Duty on the Part of AllianceRx to Fill J.J.S.'s Prescription in June 2020 Terminated upon the Closing of AllianceRx's File at 12:52 pm on June 16, 2020

Under AllianceRx's policies and procedures, if prescriptions such as the Lupron Depot prescription at issue in this case require prior authorization from a health insurance plan, then an AllianceRx representative is required to make three attempts to contact the prescribing doctor's office to have them initiate the prior authorization process. (Statement of Undisputed Material Facts ("SUMF"), ¶¶ 8-12). On June 11, 2020, AllianceRx insurance verification specialist, Janet Jebi made the first attempt by faxing the prior authorization paperwork to Dr. Hildebrand's office, and requesting that it initiate the process with BCBSOK. (SUMF, 19-28).

On June 15, 2020, AllianceRx insurance verification specialist, Janet Jebi made the second attempt with two separate phone calls to Dr. Hildebrand's office to inform that office that it needed to contact BCBSOK to initiate the prior authorization process. (SUMF, ¶¶ 29-30). Also on June 15, 2020, AllianceRx patient-care advocate, Mykeila Carrington informed Plaintiff Jacqueline

Scholl that a prior authorization was needed before the Lupron Depot prescription could be filled. (SUMF, ¶ 31).

On June 16, 2020, AllianceRx insurance verification specialist, Janet Jebi made the third attempt. This attempt included contacting BCBSOK to determine whether Dr. Hildebrand's office had initiated the prior authorization process. (SUMF, ¶ 32). On the same date, upon learning that Dr. Hildebrand's office had not initiated the prior authorization process, AllianceRx insurance verification specialist, Janet Jebi furthered her third attempt by again contacting Kristen Cornwell in Dr. Hildebrand's office to have that office initiate the prior authorization with BCBSOK. (SUMF, ¶ 33).

AllianceRx representatives also went above and beyond the requirements of their job duties and made a fourth attempt to initiate the prior authorization process. Also on June 16, 2020, at the request of AllianceRx patient-care advocate, Mykeila Carrington, a different AllianceRx insurance verification specialist contacted BCBSOK and verified that Dr. Hildebrand's office had not initiated a prior authorization request. (SUMF, ¶ 34). Subsequently thereafter, on the same date, patient-care advocate, Mykeila Carrington left a voicemail for Plaintiff Jacqueline Scholl informing her that a prior authorization had not been initiated between Dr. Hildebrand's office and BCBSOK and that Dr. Hildebrand's office needed to contact BCBSOK to initiate the process. (SUMF, ¶ 36).

Pursuant to AllianceRx's policies and procedures, if the prior authorization process was not initiated by the third attempt, AllianceRx's policy stated that the prescription should be referred for "No Go" approval and the patient informed. (SUMF, ¶ 13). Having made three unsuccessful attempts to have the prior authorization process initiated by Dr. Hildebrand's office, on June 16, 2020, AllianceRx insurance verification specialist, Janet Jebi referred the Lupron Depot

-17-

prescription for No Go approval. (SUMF, ¶ 33). Additionally, as detailed above, also on June 16, 2020, at or before 10:51:40, patient-care advocate, Mykeila Carrington left a voicemail for Plaintiff Jacqueline Scholl informing her that a prior authorization had not been initiated between Dr. Hildebrand's office and BCBSOK and that Dr. Hildebrand's office needed to contact BCBSOK to initiate the process. (SUMF, ¶ 36). Having found that the appropriate policies and procedures were followed in attempting to obtain prior authorization – in fact, more attempts were made than required by AllianceRx policies and procedures - the No Go was approved and the Lupron Depot prescription file closed at approximately 12:52 pm on June 16, 2020. (SUMF, ¶¶ 14, 37).

The undisputed evidence shows that AllianceRx representatives followed appropriate policies and procedures in attempting to obtain prior authorization. Having been unsuccessful, AllianceRx representatives thereafter followed appropriate policies and procedures to close the Lupron Depot prescription file at 12:52 pm on June 16, 2020. Consequently, any duty AllianceRx assumed to fill the Lupron Depot prescription in June 2020 terminated upon the closing of its file on June 16, 2020.

Plaintiffs will likely assert that, during an unspecified call with an AllianceRx representative, Plaintiff Jacqueline Scholl attempted to pay for the Lupron Depot prescription out-of-pocket if there were problems with insurance coverage, but Mrs. Scholl was told by the AllianceRx representative that she could not. The only evidence supporting this allegation is the testimony of Plaintiff Jacqueline Scholl. Nevertheless, assuming the truth of the testimony, there remains no evidence that AllianceRx assumed a duty to fill the Lupron Depot prescription based upon Plaintiff Jacqueline Scholl's alleged promise to pay out-of-pocket.

AllianceRx has no record that Plaintiff Jacqueline Scholl attempted to pay for the Lupron Depot prescription out-of-pocket. (*See generally,* Ex. 9 p. WALGREENS 0002-00022). Further,

-18-

AllianceRx permits patients to pay for prescriptions directly out of pocket. (SUMF, ¶ 18). Such transactions are handled by AllianceRx's billing department. (*Id.*). Despite this policy, there is no evidence that AllianceRx acted affirmatively to fill the Lupron Depot prescription based upon an alleged promise from Plaintiff Jacqueline Scholl to pay for the prescription out of pocket.

Under Oklahoma law, any duty that AllianceRx assumed to fill the Lupron Depot prescription in June 2020 terminated upon the closing of its file at 12:52 pm on June 16, 2020. Moreover, in following its policies and procedures in attempting to obtain the prior authorization, and in closing the file once the prior authorization had not been obtained, AllianceRx acted reasonably in terminating any duty it previously assumed to fill the prescription in June 2020. *See* Restatement (Second) of Torts § 323, cmt. c) ("The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue them indefinitely . . .").

### D.   After Closing its File at 12:52 pm on June 16, 2020, AllianceRx Did Not Assume a Duty to Fill the Lupron Depot Prescription Until July 13, 2020

The evidence in this case indicates that AllianceRx affirmatively re-assumed a duty to fill the Lupron Depot prescription when it was first notified that the Prior Authorization was approved on July 13, 2020. (SUMF, ¶¶ 44). The evidence further shows that AllianceRx representatives followed the companies policies and procedures to timely fill the prescription on July 21, 2020. (SUMF, ¶¶ 45-52).

AllianceRx's corporate representative also testified at deposition that filling specialty prescriptions is more complex than filling prescriptions in the retail pharmacy setting and that the industry average for filling a specialty prescription in 2020 was 6-8 business days. (SUMF, ¶ 17). The Lupron Depot prescription in this case was filled and delivered to Dr. Hildebrand's office in 6 business days (8 calendar days). (SUMF, ¶¶ 45-52). Further, AllianceRx's corporate

representative testified that no AllianceRx employees were coached as a result of the allegations at issue. (SUMF, ¶ 16). Therefore, the evidence establishes that AllianceRx representatives followed appropriate policies and procedures to timely fill the Lupron Depot prescription on July 21, 2020.

Plaintiffs will likely argue that Plaintiff Jacqueline Scholl communicated the Prior Authorization to AllianceRx during a 77-second phone call at approximately 3:48 pm on June 16, 2020. As a preliminary matter, the only evidence regarding the substance of this phone call is the self-serving testimony of Plaintiff Jacqueline Scholl. Testimony which is contravened by other testimonial and documentary evidence. First, AllianceRx has no record of this phone call. (SUMF, ¶ 30).

Second, other evidence indicates that Kristen Cornwell in Dr. Hildebrand's office did not communicate the Prior Authorization number to Plaintiff Jacqueline Scholl between the time that Kristen Cornwell received the Prior Authorization and the time that Plaintiff Jacqueline Scholl allegedly communicated it to AllianceRx. Specifically, on June 16, 2020, at approximately 12:53 pm, Kristen Cornwell in Dr. Hildebrand's office received the preliminary Prior Authorization from a BCBSOK representative pending verification of J.J.S.'s clinical information. (SUMF, 38). At approximately 1:36 pm, also on June 16, 2020, Plaintiff Jacqueline Scholl telephoned Dr. Hildebrand's office. (SUMF, ¶ 39). According to records obtained from Dr. Hildebrand's office, as well as the deposition testimony of Kristen Cornwell in Dr. Hildebrand's office, the 1:36 pm phone call on June 16, 2020, was for Plaintiff Jacqueline Scholl to inform Dr. Hildebrand that Mrs. Scholl had consulted with a specialist regarding J.J.S.'s condition, and to get Dr. Hildebrand to write J.J.S. a prescription for birth control to suppress her menstruation. (SUMF, ¶ 40). Neither the records from Dr. Hildebrand's office nor the deposition testimony of Kristen Cornwell indicate

that Kristen Cornwell communicated the Prior Authorization number to Plaintiff Jacqueline Scholl during this 1:36 pm phone call on June 16, 2020. (SUMF, ¶ 40).

This 1:36 pm phone call is the only documented communication between Plaintiff Jacqueline Scholl and Dr. Hildebrand's office between the time that Kristen Cornwell received the preliminary Prior Authorization number from BCBSOK at 12:53 pm on June 16, 2020, and the 3:48 pm phone call from AllianceRx to Plaintiff Jacqueline Scholl on June 16, 2020. (SUMF, ¶ 40). Moreover, the documentation of the call does not reflect that it is a call between Plaintiff Jacqueline Scholl and Kristen Cornwell in Dr. Hildebrand's office. Instead, the document appears to merely be a message taken for Dr. Hildebrand by a separate, unknown member of Dr. Hildebrand's staff. (Ex. 20).

Additionally, after the 10:48 am call between AllianceRx insurance verification specialist, Janet Jebi and Kristen Cornwell in Dr. Hildebrand's office on June 16, 2020, AllianceRx received no further communication from Dr. Hildebrand's office until July 13, 2020. (SUMF, ¶ 33). Further, after the 3:48 pm call on June 16, 2020 from AllianceRx to Plaintiff Jacqueline Scholl, there were also no more communications between AllianceRx and Plaintiffs until July 16, 2020. (SUMF, ¶ 42). The evidence detailed above, therefore, indicates that Kristen Cornwell did not communicate the Prior Authorization number to Plaintiff Jacqueline Scholl prior to the 3:48 pm call received by Mrs. Scholl from AllianceRx. Therefore, Plaintiff Jacqueline Scholl could not have communicated the Prior Authorization number to an AllianceRx representative during that call.

Nevertheless, even assuming arguendo that Plaintiff Jacqueline Scholl communicated the Prior Authorization number to an AllianceRx representative at 3:48 pm on June 16, 2020, there remains no evidence that AllianceRx took any affirmative action to reopen its file and re-assume the duty to fill the Lupron Depot prescription. Such re-assumption requires AllianceRx to

affirmatively act to fill the prescription after Plaintiff Jacqueline Scholl communicated the Prior Authorization to AllianceRx. *See Fry Land & Cattle Co. v. Colorado Interstate Gas Co.,* 1990 OK CIV APP 113, 805 P.2d 695, 696 (emphasis added) ("Even when a person has no duty to act with regard to a matter, **if he volunteers to assume that duty, either expressly or by his conduct**, he must exercise ordinary care and is liable for injury resulting from his failure to do so." ).

In the present case, AllianceRx has no record of the 3:48 pm phone call. (SUMF, ¶ 42). Further, on July 13, 2020, when Kristen Cornwell in Dr. Hildebrand's office contacted AllianceRx, Ms. Cornwell was advised the prescription order was closed because a prior authorization was never received. (SUMF, ¶ 44). Consequently, the undisputed evidence establishes that any duty on the part of AllianceRx to fill J.J.S.'s prescription in June 2020 terminated upon the closing of AllianceRx's file at 12:52 pm on June 16, 2020. The evidence further establishes that AllianceRx took no affirmative action to assume the duty to fill J.J.S.'s Lupron Depot prescription until July 13, 2020.

**E.      There is no Causal Connection between AllianceRx's filling of the Lupron Depot Prescription in July 2020 and Plaintiffs' Injuries**

As outlined above, any duty that AllianceRx assumed to fill the Lupron Depot prescription in June 2020, terminated when AllianceRx closed its file at 12:52 pm on June 16, 2020, after four unsuccessful attempts to obtain the Prior Authorization. Subsequently thereafter, AllianceRx assumed no duty to fill the Lupron Depot prescription until July 13, 2020, when Kristen Cornwell in Dr. Hildebrand's office informed an AllianceRx representative that the Prior Authorization had been approved. (SUMF, ¶¶ 44, 46-47, 49-52). The evidence establishes that AllianceRx did not assume a duty to fill the prescription until after J.J.S.'s hospitalization on July 8, 2020. The evidence further shows that, even had J.J.S. received the Lupron Depot on July 13, 2020, the point when AllianceRx assumed the duty to fill the prescription, it would not have prevented J.J.S.'s re-

hospitalization on July 15, 2020, or Plaintiffs' other alleged injuries arising from these hospitalizations.

"[I]n order for Plaintiff to recover on a negligence action, there must be a causal connection between Defendant's actions and the injury. "*Alexander v. Smith & Nephew, P.L.C.,* 98 F. Supp. 2d 1287, 1296 (N.D. Okla. 2000) (citation omitted). Here, as discussed above, AllianceRx affirmatively acted to fill the Lupron Depot prescription on July 13, 2020, and the prescription was delivered on July 21, 2020. Because AllianceRx did not assume a duty to fill the Lupron Depot until after J.J.S.'s surgery on July 8, 2020, there can be no causal connection between AllianceRx's actions in filling the prescription and J.J.S.'s surgery on July 8, 2020.

In addition, J.J.S.'s treating OB/GYN, Dr. Hildebrand offered deposition testimony that Lupron Depot generally begins to work within 10 days of injection, and had J.J.S. received a Lupron Depot injection by approximately June 28, 2020, her July 8, 2020 surgery and subsequent re-hospitalization on July 15, 2020 could have been avoided. (SUMF, ¶ 53). Consequently, even had J.J.S. received Lupron Depot on July 13, 2020, when AllianceRx assumed the duty to fill the prescription, the Lupron Depot would not have become effective in time to prevent her re-hospitalization on July 15, 2020. Therefore, no causal connection can exist between AllianceRx's assumption of the duty to fill the Lupron Depot prescription on July 13, 2020, and J.J.S.'s July 8, 2020 surgery and subsequent re-hospitalization on July 15, 2020.

## IV.    <u>CONCLUSION</u>

Any duty that AllianceRx assumed to fill the Lupron Depot prescription in June 2020 terminated upon the closing of its file at 12:52 pm on June 16, 2020. After closing its file at 12:52 pm on June 16, 2020, AllianceRx did not assume a duty to fill the Lupron depot prescription until

July 13, 2020. Finally, there is no causal connection between AllianceRx's filling of the Lupron Depot prescription in July 2020 and Plaintiffs' injuries.

WHEREFORE premises considered AllianceRx respectfully prays the Court enter an order granting summary judgment in its favor and against Plaintiffs, and for such other relief the Court deems just and equitable.

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 18th day of August, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all counsel of record in this action.

<u>/s/ *Caleb S. McKee*</u>
Caleb S. McKee

213.040