# United States District Court
## for the Northern District of Oklahoma

---

Case No. 21-cv-363-JDR-MTS

---

ERIC F. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; JACQUELINE R. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; J.J.S., *a minor child*,

*Plaintiffs,*

*versus*

WALGREENS SPECIALTY PHARMACY, LLC, *doing business as Alliance Rx Walgreens Prime*, *and* WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC, *a foreign company,*

*Defendants.*

---

### OPINION AND ORDER

---

The facts of this case are undeniably tragic: Plaintiffs Eric and Jacqeline Scholl's minor daughter, J.S., was diagnosed with a rare condition that prevents her body from expelling fluid and other materials from her uterus during menstruation. Faced with limited treatment options, some of which carry long-term negative consequences, the Scholls elected to temporarily treat J.S. with Lupron Depot, a medication that would suppress J.S.'s menstruation until she was older and better able to understand the risks of the other, permanent treatment options. J.S.'s physician, Dr. Hildebrand, submitted a prescription for Lupron Depot to Defendants Walgreens Specialty Pharmacy, LLC and Walgreens Specialty Pharmacy Holdings, LLC.[1] But the prescription went unfilled for over forty days. During that period, J.S.

---

[1] The Court refers to the Defendants collectively as Walgreens.

Case No. 21-cv-363

experienced complications that necessitated emergency surgery and two sep-
arate hospitalizations.

The Scholls sued Walgreens in Oklahoma state court alleging that J.S.
would not have needed to undergo surgery or experience the pain associated
with her medical complications if Walgreens had timely filled J.S.'s prescrip-
tion. Dkt. 2-1. Walgreens removed the action to this Court [Dkt. 2] and sub-
sequently filed a motion for summary judgment, which is now fully briefed.
Dkts. 41, 46, 53.[2] In their briefs, the parties engage in detailed arguments
about who communicated what to whom, and when. Although the parties'
arguments are complicated, the questions for this Court to resolve are
straightforward: Did Walgreens owe Plaintiffs a duty to fill J.S.'s prescription,
and if not, did Walgreens have a duty to provide Plaintiffs with additional in-
formation about the status of that prescription? The Oklahoma Courts have
not expressly spoken on this issue, so the Court must attempt to predict, un-
der *Erie*, how the Oklahoma Supreme Court would rule.[3] *Iron Bar Holdings,
LLC v. Cape*, ___ F.4th ___, 2025 WL 840797, at *8 (10th Cir. March 18,
2025). The Court predicts that the Oklahoma Supreme Court would answer
both questions in the negative. The Court therefore grants Walgreens's mo-
tion for summary judgment [Dkt. 41].

I[4]

In May 2020, J.S. was diagnosed with vaginal agenesis, a soft-tissue
obstruction that prevents the body from expelling materials associated with
menstruation. Dkt. 41 at 5; Dkt. 46 at 5. Her physician, Dr. Hildebrand, ad-
vised that the condition could be treated by either a complete hysterectomy

---

[2] All citations utilize CMECF pagination.

[3] The *Erie* doctrine requires federal courts to apply state substantive law when re-
solving disputes not directly implicating a federal question. *Erie R.R. Co. v. Thompkins*, 304
U.S. 64, 78 (1938).

[4] The facts set forth in this section are undisputed unless otherwise noted.

Case No. 21-cv-363

or surgery to remove soft tissue from the vaginal canal. Dkt. 46 at 12; Dkt. 53 at 2. The former option would prevent J.S. from bearing children of her own. The latter would require a long and painful recovery, and Dr. Hildebrand was concerned that the recovery might be too painful and difficult for a twelve-year-old child. Dkt. 46 at 12. Dr. Hildebrand recommended temporarily treating J.S. with Lupron Depot, a hormone injection that prevents ovulation, until she was old enough to decide between the two permanent treatment options. *Id.* at 13.

Faced with "three bad choices," the Scholl family opted to temporarily defer surgery by administering the Lupron Depot shots. Dkt. 46 at 13; Dkt. 53 at 2. On June 1, 2020, Dr. Hildebrand's office sent a referral to Abbvie, the manufacturer of Lupron Depot, for the prescription. Dkt. 41 at 5; Dkt. 46 at 5. Abbvie, in response, recommended that Dr. Hildebrand obtain preauthorization for the medication, advised Dr. Hildebrand that she might be required to provide additional clinical information to support the prescription request, and informed her that the "approximate turn-around time" for the medication would be "7-14 days after initiation with the insurance company." Dkt. 41 at 6; Dkt. 46 at 5.

Walgreens received prescription information from Abbvie on June 2, 2020. Dkt. 41 at 9.[5] Dr. Hildebrand's office validated the prescription the following day. Dkt. 41 at 3. Walgreens performed a benefits investigation to determine whether the prescription would be covered by the Scholls' health insurer, Blue Cross and Blue Shield of Oklahoma. *Id.*; Dkt. 46 at 8.[6] On June 11, 2020, Walgreens determined that preauthorization for the prescription

---

[5] The parties dispute whether the information from Abbvie constituted a valid prescription. *See* Dkt. 46 at 8. The dispute is not material to the Court's analysis.

[6] The Scholls dispute many of the factual statements set forth in section II.D of Walgreens's brief, [Dkt. 46 at 8], but the evidence cited by the Scholls does not establish a genuine dispute regarding any of the limited facts set forth in this paragraph. Fed. R. Civ. P. 56(c).

Case No. 21-cv-363

was required and that only Dr. Hildebrand could initiate the preauthorization process. Dkt. 41 at 9-10; Dkt. 46 at 8. Accordingly, Walgreens faxed preauthorization paperwork to Dr. Hildebrand's office on June 11, 2020. Dkt. 41 at 10; Dkt. 46 at 8. The paperwork stated that the insurer "[would] only accept a call from the doctor's office to begin the process" and "[would] not take information from the pharmacy." Dkt. 41-13.

On June 15, Walgreens informed Ms. Scholl that it could not fill J.S.'s prescription until it received preauthorization. Dkt. 41 at 11; Dkt. 46 at 8.[7] Walgreens had two discussions with Dr. Hildebrand's office regarding the need for preauthorization that same day. Dkt. 41 at 10-11. On or before June 16 at 10:48 a.m., Walgreens spoke with Dr. Hildebrand's office a third time and learned that no preauthorization request had been initiated. Dkt. 41 at 10-11.[8] Walgreens then placed the prescription on hold and later closed the prescription file. *Id.* at 12; Dkt. 46 at 9.

The parties agree that Dr. Hildebrand received a preauthorization number for the prescription from Blue Cross Blue Shield at approximately 12:53 p.m. on June 16, 2020. Dkt. 41 at 12; Dkt. 46 at 10.[9] They disagree, however, about whether and when this information was communicated to

---

[7] Ms. Scholl does not dispute the contents of the call recited by Walgreens but adds that she offered to pay for the prescription out-of-pocket during this call and was told—incorrectly—that she could not do so. Dkt. 46 at 8. The Court accepts Ms. Scholl's additional facts as true for purposes of this opinion.

[8] The Scholls dispute the precise timing of one call and the party responsible for initiating another. Dkt. 46 at 8-9. These details are not material to the Court's analysis. The Scholls do not dispute the timing of the June 16 call, nor do they dispute Walgreens's claim that the need for preauthorization was communicated to Dr. Hildebrand's office during these calls. Dkt. 46 at 9. The Scholls do not dispute Walgreens's assertion that there was no preauthorization on file by 10:48 a.m. on June 16, 2020. *See* Dkt. 41 at 11-12; Dkt. 41-15; Dkt. 41-27; Dkt. 46 at 9.

[9] The Scholls allege that, had Walgreens called Blue Cross Blue Shield after 2:55 p.m. on June 16, Walgreens would have been given the preauthorization number. Dkt. 46 at 18; Dkt. 53 at 8. Walgreens does not deny that it would have received the number if it had contacted Blue Cross Blue Shield, but denies it had any obligation to do so. Dkt. 53 at 8-9.

Case No. 21-cv-363

Walgreens. The Scholls contend that both Dr. Hildebrand's office and Ms. Scholl provided Walgreens with the preauthorization number the day they received it. Walgreens denies this. *Compare* Dkt. 46 at 17, *with* Dkt. 53 at 7-8. The Court construes this dispute in favor of the Scholls and assumes that the information was communicated to Walgreens at approximately 12:53 p.m. on June 16, 2020. There is no evidence or testimony as to what Walgreens said when it received the preauthorization, nor is there any evidence indicating that Walgreens agreed, promised, or otherwise indicated it would begin the process of filling the prescription upon receipt of the preauthorization number on June 16.

Although the parties disagree about who made contact with whom on June 16, they agree that communications between the parties ceased, for a time, after that date. Dkt. 41 at 11-13; Dkt. 46 at 9. Walgreens did not contact the Scholls, Dr. Hildebrand's office, or Blue Cross Blue Shield to request a preauthorization number at any time between June 17 and July 12, 2020, and neither the Scholls nor Dr. Hildebrand called Walgreens to check on the status of the prescription during that time. Dkt. 41 at 11-13; Dkt. 46 at 9. Walgreens's file for J.S.'s Lupron Depot shot remained closed during this twenty-six-day period. Dkt. 41 at 12; Dkt. 46 at 9.

On July 8, 2020, J.S. was hospitalized with extreme abdominal pain. Dkt. 46 at 18; Dkt. 53 at 8. She underwent surgery to remove both her appendix and blood that had accumulated in her pelvic cavity. Dkt. 41 at 14. She was discharged on July 11, 2020. *Id.* Two days later, one of Dr. Hildebrand's employees, Kristen Cornwell, called Walgreens and advised that J.S. needed the Lupron Depot shot as soon as possible. Dkt. 46 at 18. Walgreens informed Ms. Cornwell that the prescription file had been closed because Walgreens had not received the required preauthorization. Dkt. 41 at 14; Dkt. 41-9 at 3.[10]

---

[10] The Scholls contend that Walgreens's exhibit 9 does not support all of the factual representations set forth in Walgreens's motion. Dkt. 46 at 44. They do not, however, point

5

Case No. 21-cv-363

Ms. Cornwell responded that the preauthorization number was "updated" and that J.S. needed the medication as soon as possible. Dkt. 41 at 14; Dkt. 41-9 at 3. Walgreens created a fill request in response to this call. Dkt. 41-9.

J.S. was re-admitted to the hospital on July 15, 2020, with symptoms of abdominal pain and vomiting. Dkt. 41 at 14; Dkt. 46 at 11. On July 16, Ms. Cornwell again called Walgreens and stated that J.S. needed the Lupron Depot injection as soon as possible and could not be discharged without it. Dkt. 41 at 14; Dkt. 46 at 11. That same day, Walgreens verified that the preauthorization had been approved by the Scholls' insurer and elevated the prescription request to "stat" priority pending verification of insurance benefits. Dkt. 41 at 15. J.S. was discharged on July 17, 2020, and consent to ship the prescription to Dr. Hildebrand's office was obtained that same day. *Id.* The medication was delivered to Dr. Hildebrand's office on July 21, 2020, where it was administered to J.S. Dkt. 46 at 19; Dkt. 53 at 9.

On July 30, 2021, the Scholls sued Walgreens for negligence in Tulsa County district court. Dkt. 2-1. Walgreens removed the case to this Court. Dkt. 2. The Scholls' petition, which was never amended and remains the operative pleading, alleges that Walgreens negligently failed to deliver the Lupron Depot shot to Dr. Hildebrand in a timely manner and that J.S. suffered damages in the form of unnecessary surgery, medical expenses, and pain and suffering as a result of Walgreens's negligent conduct. Dkt. 2-1 at 6. Walgreens now asks this Court for an order granting summary judgment in its favor on the sole claim in the petition. Dkt. 41.

## II

Summary judgment is appropriate if there exist no genuine disputes as to any material fact and the moving party "'is entitled to judgment as a matter of law.'" *Schrock v. Wyeth, Inc.,* 727 F.3d 1273, 1279 (10th Cir. 2013) (quoting

---

to any evidence that contradicts the information set forth in exhibit 9. The Court concludes that exhibit 9 adequately supports the limited facts set forth herein.

Fed. R. Civ. P. 56(a)). The Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Id.* The parties agree that Oklahoma law governs this dispute, and it is therefore this Court's obligation to "'interpret and apply the law of [Oklahoma] as . . . the [Oklahoma] Supreme Court would.'" *Id.* at 1280 (bracketed alterations in original) (quoting *High Plains Natural Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 288 (10th Cir.1989)).[11] Where the Oklahoma Supreme Court has not addressed a legal issue, this Court "may seek guidance from decisions rendered by lower courts in [Oklahoma], appellate decisions in other states with similar legal principles, district court decisions interpreting the law of [Oklahoma], and the general weight and trend of authority in the relevant area of law." *Id.* (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir.2007)).

### III

The threshold question is this: Did Walgreens have a duty to fill J.S.'s prescription for Lupron Depot? *See Lowery v. Echostar Satellite Corp.*, 2007 OK 38, ¶ 12, 160 P.3d 959, 964 (recognizing that the "existence of a duty of care is the threshold question in any negligence action" (citation omitted)). If the Court answers this question of law in the affirmative, it may then determine whether Walgreens breached that duty and whether J.S. was injured as a result. *See id.* (setting forth the three essential elements of a negligence claim). If not, "there can be no liability for negligence as a matter of law." *Id.*

Ordinarily, the Court would begin its analysis by looking to the decisions of the Oklahoma Supreme Court. *See Schrock,* 727 F.3d at 1280. In this case, however, Oklahoma has enacted a legal and regulatory scheme that governs the duties and obligations of pharmacists and pharmacies. *See* Okla. Stat. tit. 59, §§ 353 *et seq.* (Oklahoma Pharmacy Act); Okla. Admin. Code §§ 535:1-

---

[11] *See also Riley v. Brown & Root, Inc.*, 896 F.2d 474, 477–78 (10th Cir.1990) (recognizing that a trial court must "'ascertain and apply the state law where ... it controls [the] decision'" (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944))).

Case No. 21-cv-363

1-1 *et seq.* Oklahoma courts addressing the duties owed by pharmacists and pharmacies will generally begin by examining the plain language of these provisions. *E.g., Carista v. Valuck*, 2016 OK CIV APP 66, ¶¶ 9-14, 394 P.3d 253, 258-59 (finding no indication that the legislature or board of pharmacy intended to impose a duty to question clients about illegal drug use and declining to create a duty that was "unsupported by existing Oklahoma state law or regulations"); *Pharmcare Oklahoma, Inc. v. State Health Care Auth.*, 2007 OK CIV APP 5, ¶ 30, 152 P.3d 267, 273 (recognizing that a "pharmacist's duty to [a] patient is clearly defined and limited under the Pharmacy Act"). This Court will do the same.

The Oklahoma Pharmacy Act is intended to "promote, preserve and protect the public health, safety and welfare by and through the effective control and regulation of the practice of pharmacy . . . ." Okla. Stat. tit. 59, § 353(B). The Act is silent as to whether a pharmacy or pharmacist has a duty to fill a prescription, but generally speaking, the Act suggests that dispensing medication is something that a pharmacist *may* do, rather than something she *must* do. *E.g., id.* at § 353.20.1(B) (recognizing that a pharmacist "may" fill a prescription when a symptom or purpose is not provided by the practitioner); *id.* at § 353.20.2(A) & (C) (permitting pharmacists to dispense varying quantities and indicating that a pharmacist "may dispense" medications without a prescription in certain, limited circumstances). In contrast, the Oklahoma Pharmacy Act *requires* pharmacists to engage in other conduct, such as transferring prescriptions upon a customer's request. *Id.* at § 354. Thus, while the Act requires pharmacists and pharmacies to engage in certain conduct, it does not expressly impose on pharmacists or pharmacies an affirmative duty to fill prescriptions.[12]

---

[12] The Court notes that Okla. Stat. tit. 59, § 353.20.2(C)(3) provides that a pharmacist who dispenses life-saving medication "in good faith" shall not be liable for civil damages "as a result of any acts or omissions except for committing gross negligence or willful or wanton acts committed in dispensing or failure to dispense" medication. Although an

Case No. 21-cv-363

The Oklahoma State Board of Pharmacy[13] "regulate[s] the practice of pharmacy" and the "dispensing of drugs and medicines." Okla. Admin. Code §§ 535:10-1-1, 535:15-1-1(a). Among other things, the Board's regulations require pharmacists to act in conformity with federal, state, and local laws; to maintain patient confidentiality; to provide appropriate counseling; to make reasonable efforts to maintain patient information generated at a pharmacy; and to refrain from conduct such as making false reports, refusing to provide prescription information upon request, and refilling prescriptions without authorization. *Id.* at §§ 535:10-3-1.1 & 1.2, 535:10-9-2. The regulations further require pharmacies to establish and maintain controls against prescription errors; to prevent the improper diversion of prescription drugs in violation of federal, state, and local law; and to report any theft or significant loss of drugs. *Id.* at § 535:15-3-2(c) & (j).

Although there are many things that pharmacists and pharmacies must do under the Oklahoma Pharmacy Board's regulations,[14] filling prescriptions is not one of them. Title 535 of the Administrative Code, like the Oklahoma Pharmacy Act, generally uses permissive language when referring to the filling of prescriptions. *E.g.,* Okla. Admin. Code § 535:15-3-11(b) (stating that prescriptions "may" be refilled as authorized, and that, after one year, a new prescription "shall" be required).

---

argument could be made that this provision recognizes the potential for liability due to "failure to dispense" a medication, the Court concludes otherwise. At most, this section recognizes that a pharmacist may be civilly liable for "willful or wanton acts committed in dispensing or failure to dispense" a medication. *Id.* It does not suggest that a duty to dispense prescription medication exists as a general matter. This finding is corroborated by the regulations governing pharmacists and pharmacies in Oklahoma, discussed *infra*.

[13] The legislature created the State Board of Pharmacy and empowered it to regulate the practice of pharmacy and the sale and distribution of drugs and medicine, to adopt rules of conduct applicable in the profession of pharmacy, and to make rules necessary for carrying out and enforcing the Oklahoma Pharmacy Act and protecting the public. Okla. Stat. tit. 59, §§ 353.3, 353.7, 355.2(B).

[14] *See, e.g.,* Okla. Admin. Code §§ 535:10-3-1.1 & 1.2, 535:10-9-2.

Case No. 21-cv-363

When J.S.'s prescription was issued in June 2020, the Administrative Code did not expressly address whether a pharmacist had an obligation to fill a prescription. In September 2022, however, the Pharmacy Board amended section 535:15-3-13(c) to "clarif[y] a pharmacist's right not to fill a valid prescription." 2022 OK REG TEXT 600564 (NS). *See* Okla. Admin. Code § 535:15-3-13(c) (providing that a "pharmacist maintains the right not to fill the valid prescription"). This amendment expressly provided what was previously only implied: Oklahoma's comprehensive statutory and regulatory scheme does not impose a duty to fill prescriptions.[15]

The Scholls point to two provisions of the Oklahoma Administrative Code that, they contend, support the existence of a duty to fill a prescription. Dkt. 46 at 21. The first, section 535:10-3-1.1(6), states that the safety of health and patients "shall be a pharmacist's first consideration." This provision applies specifically to a pharmacist's obligations of confidentiality; it has no bearing on a pharmacist's obligation to fill a prescription as a general matter. Okla. Admin. Code § 535:10-3-1.1(6). The second, section 535:10-3-1.2(11), states that a pharmacist violates the rules of professional conduct when he does not attempt to "resolve a possible prescription error" or a "situation of potential harm to the patient when apparent or should have been apparent to the pharmacist. *Id.* at § 535:10-3-1.2(11). The plain language of these provisions does not support the creation of a duty to fill a prescription, and the Court declines to read these regulations in the broad manner proposed by the Scholls. Furthermore, if the Court were to interpret either of these regulations as creating a duty to fill a prescription, the Court would create new

_____

[15] Oklahoma courts determine the retroactive impact of an amendment by examining the circumstances surrounding the amendment. *See Samman v. Multiple Inj. Tr. Fund*, 2001 OK 71, ¶ 13, 33 P.3d 302, 307. Amendments that are intended to clarify a prior legislative enactment or resolve an existing ambiguity are given retrospective force. *Polymer Fabricating, Inc. v. Emps. Workers' Comp. Ass'n*, 1998 OK 113, ¶ 15, 980 P.2d 109, 114. Based on the reasoning in *Samman* and *Polymer Fabricating*, the Court construes the amendments to section 535:15-3-13(c) as having retroactive effect.

Case No. 21-cv-363

obligations that are at odds with other express provisions in both the Oklahoma Pharmacy Act and the Oklahoma Administrative Code. *E.g.* Okla. Admin. Code § 535:15-3-13(c) (recognizing that a pharmacist has no duty to fill a prescription); Okla. Stat. tit. 59, § 353.20.2(C) (stating that pharmacists ***may*** dispense medication to save the life of a patient without ***requiring*** pharmacists to do so). The Court will not interpret Oklahoma's regulations in a manner that creates internal inconsistencies within the statutory and regulatory framework governing the practice of pharmacy.

There are no Oklahoma Supreme Court cases directly addressing whether a pharmacy has a general duty to fill a prescription upon request; however, a 2016 decision from the Oklahoma Court of Civil Appeals is instructive. In *Carista v. Valuck*, the plaintiff sued a pharmacy that had dispensed painkillers to her brother who ultimately died of an overdose. The plaintiff alleged that the pharmacist should have considered the risk created by her brother's use of and dependency on illegal drugs when determining whether to fill his prescription. *Carista*, 2016 OK CIV APP 66, ¶¶ 2, 12, 394 P.3d 253, 255, 258. After reviewing the laws and regulations governing the practice of pharmacy, the court of civil appeals found "no indication that the Board of Pharmacy intended to create a duty for pharmacists to question clients regarding illegal drug use," and concluded that the plaintiff's attempt to assert such a duty "wander[ed] too far afield from the regulatory text." *Id.* at ¶¶ 12-13, 394 P.3d at 258-59. Recognizing that the Oklahoma Pharmacy Act "clearly define[s] and limit[s]" the duties of pharmacists to their patients, the court of appeals declined to expand the duties of pharmacists in a manner "unsupported by existing Oklahoma state law or regulations" and affirmed dismissal of the plaintiff's complaint. *Id.* at ¶¶ 7, 14, 17, 394 P.3d at 257, 258-59 (quoting *Pharmcare*, 2007 OK CIV APP 5, ¶¶ 29-30, 152 P.3d 267).[16]

---

[16] In *Pharmcare*, the Oklahoma Court of Civil Appeals found that the duties of pharmacists include "accurately filling and dispensing prescriptions," among other things. *Pharmcare*, 2007 OK CIV APP 5, ¶ 30, 152 P.3d at 273. The court in *Pharmcare* did not

Case No. 21-cv-363

This Court predicts, based on the reasoning in *Carista*, that Oklahoma courts would hold that neither pharmacists nor pharmacies have a general duty to fill prescriptions. *See also Williams v. Albertsons, Inc.*, No. 95-50473, 1996 WL 167215, at *1 (5th Cir. 1996) (per curiam) (unpublished) (concluding that a pharmacy does not have a general duty to fill a prescription even where the patient had filled her prescription at the pharmacy for many years prior to the refusal). The laws and regulations defining and limiting the obligations of pharmacists do not support the creation of that duty. *Carista*, 2016 OK CIV APP 66, ¶¶ 7, 14, 394 P.3d at 257-59. Furthermore, the creation of a duty to fill a prescription would be flatly inconsistent with the regulation recognizing that pharmacists have, and have always had, an unrestricted right to refuse to fill a prescription. *See* Okla. Admin. Code § 535:15-3-13(c). It is not the role of the federal courts to create common-law rules that run counter to the laws and regulations adopted by the state. *Cf. Finnell v. Seismic*, 2003 OK 35, ¶ 15, 67 P.3d 339, 345 (recognizing that, in Oklahoma, "[s]tatutes in derogation of the common law are to be liberally construed so as to effect legislative intent" (citing Okla. Stat. tit. 25, § 29)). Accordingly, the Court concludes that, as a matter of Oklahoma law, Walgreens did not have an affirmative duty to fill J.S.'s prescription.

## IV

The Scholls argue that, even if Walgreens did not have a general duty to fill J.S.'s prescription, Walgreens nevertheless undertook a duty to J.S. and had an obligation to exercise ordinary care, diligence, and judgment in carrying out that duty. *See* Dkt. 46 at 20-23. They argue that Walgreens failed to exercise the requisite level of care with respect to its conduct between June 1

_____

address the question of whether a pharmacist has a duty to fill a prescription as a general matter, and the Court construes this language as a requirement that prescriptions be filled accurately.

Case No. 21-cv-363

and July 13.[17] In support of this argument, the Scholls point to case law addressing (A) the duty of physicians, lawyers, and other professionals to provide services in accordance with the standards of other specialists in their field [Dkt. 46 at 22-23]; (B) a physician's duty not to abandon his or her patient [Dkt. 46 at 21]; (C) a pharmacist's duty to notify patients of the need for preauthorization under Massachusetts law [Dkt. 46 at 22]; and (D) general negligence principles [Dkt. 23]. The Scholls' arguments, and the authority they rely upon, are unavailing.

A

The Court begins with the Scholls' claim that pharmacists—like lawyers and physicians—have a duty to provide care in accordance with the standards of other specialists in their field. Dkt. 46 at 22. Although the general premise recited by the Scholls is correct, its application is limited: Doctors and lawyers do not "owe a duty to exercise their particular talents, knowledge, and skill on behalf of every person they encounter in the course of the day." *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995) (cited with approval in *Jennings v. Badgett*, 2010 OK 7, 230 P.3d 861). Instead, they owe duties to those with whom they have a specialized contractual relationship, namely, their clients. *E.g., Jennings*, 2010 OK 7, ¶ 27, 230 P.3d at 868 (recognizing that a "malpractice action is one of negligence wherein the duty is born from a contractual relationship"); *Haney v. State*, 1993 OK 41, ¶ 18, 850 P.2d

---

[17] Although the Scholls continued to have issues filling J.S.'s prescription, they have not pointed to any injuries that were caused by Walgreens's conduct after July 13. *See* Dkt. 46 at 26-27; (arguing that J.S.'s pain, suffering and surgeries were the result of Walgreens's, delay, refusal to accept a cash payment, failure to communicate, and abandonment of J.S. on June 16); Dkt. 46-3 at 40 (denying any claim for damages for events after July 21, 2020); Dkt. 46-8 at 8-9. Accordingly, the Court focuses its analysis on the alleged failures that took place on or before July 13, 2020.

Case No. 21-cv-363

1087, 1092 (ordering dismissal of negligence claim where there was no attorney-client relationship with the plaintiff).[18]

There is no evidence that supports the conclusion that Walgreens had a contractual relationship with J.S. or her parents that gave rise to an affirmative duty to provide them with professional pharmacy services. Although the parties have presented evidence suggesting that Walgreens had a contractual relationship with Blue Cross Blue Shield [Dkt. 46-3 at 31], the Scholls have not pointed to any evidence that Walgreens owed contractual duties to J.S. or her parents under the terms of that agreement either directly or as third-party beneficiaries. *Cf. Jennings*, 2010 OK 7, ¶ 14, 230 P.3d at 866 (recognizing that a contractual relationship is "essential to an action for a breach of the duty giving rise to the malpractice action"); *Okla. Bar Ass'n v. Gassaway*, 2008 OK 60, ¶ 74, 196 P.3d 495, 509 (concluding no attorney-client relationship existed if the parties never "entered into a contract or discussed fees"). Thus, the contractual relationship that would ordinarily give rise to an affirmative duty to provide professional services—and use ordinary care when providing them—is absent in this case.

Nor can a contractual relationship and a corresponding duty be inferred from the parties' course of conduct. The Scholls have not pointed to any evidence that Walgreens and the Scholls had a "meeting of the minds" with respect to the material terms and provisions under which Walgreens would provide pharmacy services. *See Young v. Chappell*, 2010 OK CIV APP 76, ¶ 8, 239 P.3d 476, 479 (recognizing that, to be enforceable, a contract requires a "meeting of the minds on all the essential terms" (citation and internal quotation marks omitted)). To the contrary, the evidence shows that

---

[18] *See also, e.g., Jennings*, 2010 OK 7, ¶ 15, 230 P.3d at 865-66 (collecting cases holding that a physician's duty arises in the context of a physician-patient relationship); *Manley v. Brown*, 1999 OK 79, ¶ 8, 989 P.2d 448, 452 (recognizing that a plaintiff in a legal negligence action must establish, among other things, the existence of an attorney-client relationship).

Case No. 21-cv-363

Walgreens (1) refused to accept the Scholls' cash payment for the prescription,[19] and (2) began investigating whether it *might* fill the prescription under the Scholls' insurance plan *but stopped all attempts* to gather information or fill the prescription on June 16 at 10:48 a.m. when it concluded that it lacked the information necessary to proceed. Although the Scholls maintain that they provided a preauthorization number to Walgreens shortly after Walgreens placed J.S.'s prescription on hold, they have not cited any testimony indicating that Walgreens agreed to fill the prescription upon receipt of that information or otherwise suggested that it would begin providing pharmacy services to J.S. upon receipt of that information.[20]

Simply put, the Scholls have not introduced evidence that, if true, could establish as a matter of Oklahoma law that Walgreens undertook a duty to provide pharmacy services to J.S. on or before July 13, 2020, when Walgreens affirmatively represented that it would verify the preauthorization and begin filling the prescription. Dkt. 41 at 14. Instead, the record evidence establishes that, prior to July 13, 2020, Walgreens had not established a contractual relationship with the Scholls, nor had it undertaken an affirmative duty to provide J.S. with pharmacy services as a matter of Oklahoma law. *See, e.g., Gassaway*, 2008 OK 60, ¶ 74, 196 P.3d 495, 509 (finding that no attorney-client relationship was established when the parties never entered a contract or discussed fees, even though the attorney had received documents and visited with the client on multiple occasions); *Brisco v. Gerard*, 2023 OK CIV

---

[19] The evidence, viewed in the Scholls' favor, shows that Walgreens could have accepted a cash payment to fill the prescription but did not do so. Regardless of whether Walgreens was incorrect in its reasons for refusing the payment, the fact remains that the payment was refused; there was no agreement under which Walgreens undertook to provide pharmacy services to J.S.

[20] *See* Dkt. 41-13 (stating that the "patient's insurance drug card plan is requesting a Prior Authorization"); Dkt. 46-3 at 45 (testifying that Walgreens received the preauthorization without providing any information regarding Walgreens's response); Dkt. 46-6 at 7 (same). None of this evidence demonstrates that Walgreens affirmatively agreed to fill the prescription at any point prior to July 13.

Case No. 21-cv-363

APP 19, ¶¶ 14-15, 530 P.3d 75, 79 (finding no physician-patient relationship where the doctor did not evaluate, examine, or consult with the plaintiff, but instead simply determined whether he should be admitted to a facility).[21] Because the evidence does not establish the existence of a pharmacist-client relationship, the Scholls' claim that Walgreens failed to provide the care owed by an ordinary, skilled pharmacist must fail. *Jennings*, 2010 OK 7, ¶ 27, 230 P.3d at 86869; *Haney*, 1993 OK 41, ¶ 18, 850 P.2d at 1092.

B

The Scholls next argue that Walgreens had a duty not to abandon J.S., but the cases they cite for this proposition concern physicians, not pharmacists.[22] The Court doubts that Oklahoma would hold pharmacists, like physicians, to a duty not to abandon their patients given the marked differences in the duties owed by those two categories of professionals and the circumstances under which they provide their respective services. *Compare* Okla. Stat. tit. 59, §§ 478-518.1, *with* Okla. Stat. tit. 59, §§ 353-375.5. The fact that certain duties are owed by one group of professionals does not establish that the same duties are also owed by different, separately regulated professionals.

But even if pharmacies have a duty not to abandon their patients under Oklahoma law, Walgreens did not owe J.S. that duty based on the facts of this case. There is no evidence that J.S. was Walgreens's patient before June 13, 2020, nor is there evidence that Walgreens began providing professional services to J.S. before that date. *See* Section IV(A), *supra*. A duty not to abandon a patient only arises where the circumstances establish the existence of a

---

[21] *Cf. Oklahoma Bar Ass'n v. Dobbs*, 2004 OK 46, ¶ 19, 94 P.3d 31, 44 (finding an attorney-client relationship existed once the attorney undertook to provide services in the client's name and held himself out as her attorney).

[22] *Sparks v. Hicks*, 1996 OK 20, ¶ 11, 912 P.2d 331, 333 (discussing a **physician's** duty to give reasonable notice and opportunity to secure other attention before terminating the physician-patient relationship where further medical or surgical attention is needed); *Jackson v. Oklahoma Mem'l Hosp.*, 1995 OK 112, ¶ 18, 909 P.2d 765, 774 (same).

Case No. 21-cv-363

physician-patient relationship because the patient has "entrusted his treatment to the physician and the physician [has] accepted the case." *Jennings*, 2010 OK 7, ¶ 18, 230 P.3d at 866-67; *see Brisco*, 2023 OK CIV APP 19, ¶¶ 14-15, 530 P.3d at 79. A jury could not find, based on the facts of this case, that those prerequisites were met with respect to J.S. before July 13, 2020. The Court finds no support for the suggestion that Walgreens was required to fill J.S.'s prescription before that date under an abandonment theory.

C

The Scholls suggest that *Correa v. Schoeck* supports their assertion that Walgreens had a duty to provide the Scholls and Dr. Hildebrand with additional information regarding its policies and procedures, as well as its decision to put J.S.'s prescription on hold. 479 Mass. 686, 98 N.E.3d 191 (2018). The Court is not persuaded that the Oklahoma Supreme Court would adopt the holding in *Correa*, but even if it were to do so, the Court finds that Walgreens did not breach the duty established by the Massachusetts Supreme Court. In *Correa*, the court recognized that pharmacies owe a ***limited*** duty to notify the patient and prescribing physician when a prescription requires preauthorization. *Id.* at 698-99. The court declined, however, to require pharmacies to "follow up with the prescribing physician until they are certain that the physician received and will act upon the request for prior authorization" or "make repeated inquiries" regarding a prescription once the need for preauthorization was communicated. *Id.* at 700. And *Correa* made no mention of any purported obligation to notify a patient or medical provider of either the status of a prescription or a pharmacy's internal operating procedures. The undisputed facts of this case establish that Walgreens contacted both Dr. Hildebrand and Ms. Scholl to inform them of the need for preauthorization. *See* Dkt. 41 at 10, 11; Dkt. 46 at 8. *See also* Dkts. 41-9, 41-13. Walgreens satisfied the obligations it would owe under *Correa*. Nothing more was required of it.

D

Case No. 21-cv-363

Finally, the Court turns to the Scholls' claim that Walgreens was generally negligent with respect to its failure to fully and accurately communicate its policies to the Scholls. *See* Dkt. 46 at 20, 23 (discussing Walgreens's failure to relay information concerning its policy to place prescriptions on hold after three attempts to obtain preauthorization, which allegedly contradicted information on Walgreens's website, and Walgreens's failure to accurately state its policies regarding cash payments). Even if the Scholls had alleged facts in their petition to support this claim,[23] they have not pointed to any Oklahoma laws, statutes, or regulations stating that Walgreens owed a duty to disclose its internal policies to its customers—actual or potential—and the Court will not create one in the absence of that authority. If the Scholls are claiming that they were affirmatively misled by Walgreens's false statements, those claims sound in fraud, not negligence, and the Scholls have not asserted a fraud claim against Walgreens. The Court finds no basis for permitting the Scholls to pursue general negligence claims against Walgreens based on its alleged failure to accurately disclose information regarding its policies.

V

Logic supports this Court's decision. Walgreens could not initiate the preauthorization process itself. Only Dr. Hildebrand could do that. And only Dr. Hildebrand had the information necessary to obtain the required preauthorization. The duty to obtain payment authorization from an insurer and to communicate that authorization to the pharmacy to fulfill the prescription should fall on the prescribing physician capable of obtaining and transmitting the authorization, not the pharmacy that lacks that capability.

Once Blue Cross Blue Shield authorized the prescription, the patient or prescribing physician logically had the burden to follow up and ensure that

---

[23] The petition makes no reference to Walgreens's alleged failure to communicate with either the Scholls or Dr. Hildebrand regarding its internal policies, its decision to place the prescription on hold, or the fact that it had not received preauthorization for the medication as of June 16, 2020.

Case No. 21-cv-363

the prescription was filled. The reason for this is simple: Only the physician and the patient know whether they still need medication and, if so, how urgently it is needed. Even complicated medical issues can resolve with time; a physician may change a patient's course of treatment without notifying a pharmacy; and "[a] patient may decide at any point to take [a] prescription to a different pharmacy" or stop taking a medication altogether. *Correa*, 479 Mass. 700. A pharmacy is incapable of independently distinguishing whether silence on the part of a physician or patient is proof that they are awaiting information from the pharmacy, rather than proof that the medication was received, was filled elsewhere, is no longer urgently required, or is no longer needed at all. In contrast, the patient—and, in this case, the physician administering the medication—is uniquely situated to know whether medication is still required, how soon it is needed, and whether there is an ongoing expectation that a particular pharmacy will provide it. Given the superior ability of patients and physicians to assess the need and urgency for a medication, it is appropriate that patients and physicians, rather than pharmacies, bear the burden of following up to check the status of a requested medication. The pharmacy has no duty to chase down information to provide medication to a client.

The Scholls argue that Walgreens had a duty to inform them that it had closed its file and would not be filling J.S.'s prescription. But the Scholls do not provide a reasoned basis for imposing such a duty, and the Court cannot discern one. When a pharmacy advises that it lacks the information and ability to fill a prescription, it refuses the patient's request to fill the prescription. At that point, the burden shifts to the patient and physician to obtain the missing information and provide it to the pharmacy. A pharmacy need not inform the patient that it has no plans to fill a prescription, whether due to an internal policy or otherwise, when it has already stated that it cannot do so.

It may be that a duty to advise a patient of a decision not to fill a prescription could arise in certain circumstances: For example, a pharmacy that

19

Case No. 21-cv-363

promises to fill a prescription might have a contractual duty to perform as promised; a pharmacy that represents that it will fill a prescription upon receipt of certain information might have a duty to advise the patient if it closes its file even after receiving that information. But the Court need not evaluate whether such duties exist, because those facts are not present here. The facts of this case demonstrate that Walgreens advised the Scholls and Dr. Hildebrand that it needed prior authorization to fill a prescription and closed its file when it did not receive that authorization. At that point, Walgreens's duties with respect to the Scholls and J.S. were extinguished. Although Walgreens allegedly received the preauthorization number after it closed its file, there is no evidence that Walgreens agreed to fill the prescription, stated that it would initiate a fill request, coordinated delivery, or otherwise gave any indication that it would undertake any obligation with respect to the prescription. Absent that evidence, the Court concludes that Walgreens had no further duties with respect to the Scholls and J.S. until July 13, when it agreed to fill the prescription—and did so.

VI

The Court predicts that Oklahoma courts would hold that pharmacists do not owe a general duty to fill prescriptions under Oklahoma law. Furthermore, there is no evidence or suggestion that Plaintiffs' injuries were caused by Walgreens's conduct after July 13, 2020, nor is there evidence that would permit a jury to conclude that, prior to July 13, 2020, Walgreens had a pharmacist-client relationship with J.S. or undertook a duty to J.S. that would support a professional negligence claim. Finally, the Court concludes that Walgreens had no legal obligation to notify the Scholls of its internal policies, its decision to place J.S.'s prescription on hold, or the fact that it had not received preauthorization for that prescription. In the absence of these duties, there can be no recovery for negligence. Accordingly, Walgreens's motion for summary judgment [Dkt. 41] is granted, and judgment is entered in favor of

Case No. 21-cv-363

Walgreens Specialty Pharmacy, LLC and Walgreens Specialty Pharmacy Holdings, LLC.

DATED this 28th day of March 2025.

_____

JOHN D. RUSSELL
*United States District Judge*